Suzanne B. Chanti, OSB #88179
schanti@chantilaw.com
Jennifer J. Middleton, OSB #071510
jmiddleton@chantilaw.com
Chanti & Middleton, PC
245 East 4th Avenue
Eugene, OR 97401
Phone: 541/683-2506
Fax:    541/683-3149
   Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOSEPH DOWNEY WADE,** | Case No. 01-6178-HO |
| Plaintiff, | **MOTION TO ENFORCE SETTLEMENT AGREEMENT** |
| vs. | **ORAL ARGUMENT REQUESTED** |
| **STATE OF OREGON; UNIVERSITY OF OREGON; and JOHN MOSELEY, in his official and individual capacities,** | |
| Defendants. | |

The parties in the above captioned matter have made a good faith effort through a telephone conference to resolve the dispute and have been unable to do so.

**I.    Background.**

On June 3, 2002, Dr. Joseph Wade settled his discrimination claims against the University of Oregon, (hereafter "UO"). Material terms of that Settlement Agreement (attached hereto as **Exhibit A**) included promises by the UO to take substantial steps designed to achieve ethnic and racial diversity in its work force, including employment of minorities as Officers of

Administration and in other positions at the highest administrative executive levels. As part of that effort, Dr. Wade secured promises that UO would comply with the procedural requirements of its affirmative action policies.

Pursuant to the Settlement Agreement and Court Order, Magistrate Judge Thomas Coffin retained jurisdiction over the Settlement Agreement to resolve any future disputes between the parties. Dr. Wade by information and belief, contends that UO has repeatedly violated both the terms and spirit of the Agreement and seeks the Court's intervention in implementing an acceptable remediation of those breaches.

## II. Breach of the Agreement.

### A. Promises regarding the position of Vice Provost for Institutional Diversity.

UO of agreed to create a position of Vice Provost for Institutional Diversity and to hire qualified individuals in that position pursuant to UO's Affirmative Action plan. Dr. Wade has a good faith belief that the University has failed to follow the specific terms of the Agreement. Paragraph A.(d) of the Agreement states that "[i]n filling the position, all University affirmative action principles and procedures shall be adhered to and the University shall make vigorous efforts to recruit and hire a qualified person of color or someone who has clearly demonstrated sensitivity to and accomplishments in issues of diversity, including race."

Dr. Wade believes that this provision has been violated.

By information and belief, Dr. Wade understands that UO first hired Gregory Vincent into the position. Dr. Vincent was hired pursuant to a national search that was compliant with UO affirmative action policies and procedures. Specifically, those procedures require the following: a search committee is created, job criteria is

developed, the job is advertised nationally with emphasis on recruiting qualified women and minorities, a pool of qualified applicants, including minorities and women is developed, and based on the job criteria, the most qualified candidate is selected.

Dr. Vincent resigned his position in 2005 and UO temporarily appointed Charles Martinez, a professor in its Education Department, into the position. Based on information and belief, Dr. Wade understands that in 2006 the Provost Moseley formerly appointed Dr. Martinez into the position without implementing a search process.

Dr. Wade believes this is a violation of the Agreement because in first making an interim appointment and then using the interim appointment experience as a basis for appointing Dr. Martinez without a full search, UO failed to follow its own Affirmative Action policies and procedures requiring the development of specific job criteria and a full search and selection of a qualified candidate based upon that search. Dr. Martinez, who already had a full-time position, was appointed to the position and as far as Dr. Wade can tell, continued the full-time work he was engaged in prior to the appointment. Dr. Wade understands that UO apparently believes that filling the position with an individual who is a minority is sufficient to meet the terms of the Agreement.

Dr. Wade disagrees. First, by appointing Dr. Martinez instead of developing the requisite job criteria and completing a national search, UO has simply added duties to someone who already had more than a full-time position. This, Dr. Wade fears, diminishes the opportunity for the position to be effectively served. In addition, the appointment without a search process denigrates the purpose of the affirmative action policies to recruit the most qualified minorities and women into positions and sets precedent for circumvention of the affirmative action policies in situations that will not

necessarily result in the hire of a minority. Finally, appointing Dr. Martinez without a search effectively "recycles" current minority employees and thwarts the purpose of affirmative action policies to increase the number of minority employees at UO. Indeed, the focus of the Settlement Agreement for Dr. Wade was to assist UO in increasing the number of qualified minorities in administrative and academic positions.

**B.  Breach of paragraph 2 of the Agreement.**

UO agreed to hire a Vice President for Student Affairs and to make "vigorous efforts to recruit and hire a qualified person of color, or someone who has clearly demonstrated sensitivity to and accomplishments in issues of diversity." Based on information and belief, Dr. Wade understands that UO violated this provision in several respects. First, UO appointed a Caucasian, Anne Leavitt into the position on an "interim basis." Subsequent to the signing of the Agreement, Dr. Leavitt was appointed into the position on a permanent basis, thus circumventing UO affirmative action policies requiring a full search process and ignoring the agreement to make "vigorous efforts to recruit." When Leavitt resigned in 2005, a Caucasian, Mike Eyster, Director of Housing was appointed on an interim basis, again without a search. In 2007, an African American and former director of UO Counseling Center and interim Dean of Students, Robin Holmes, was appointed, again without a search compliant with UO search procedures.

Dr. Wade believes that the practice of appointing individuals on an interim basis and then appointing them permanently into the position is a violation of UO hiring procedures and violates and denigrates the principles of affirmative action. As Dr. Wade understands it, there was no national search for this position, no job criteria developed and no effort to assure that the most qualified candidates, including the most qualified

minority candidates, were given an opportunity to apply. Finally, Dr. Holmes was a current UO employee. Hiring her without subjecting the position to a national search precluded the possibility of finding another qualified minority candidate and thus actually increasing the number of minority employees.

**C.     Breach of paragraph 3 of the Agreement.**

UO promised to develop and initiate a systemic exit interview protocol for all faculty and staff leaving UO in order to ascertain the basis of their departure. These exit interviews were to be made available to the Director of Affirmative Action and the Vice Provost for Institutional Diversity. The Agreement called for this protocol to be implemented by August 31, 2002. Based on his information and belief, Dr. Wade understands that UO has failed to institute such a protocol.

**C.     Proposed Remedy.**

Dr. Wade is disappointed that UO through its internal appointment procedures, has circumvented both the spirit and the letter of the Agreement. His intent was that UO make efforts to recruit nationally to find the most qualified minorities into the positions at issue, thereby increasing the total number of minorities holding positions at UO and assuring that the best qualified candidates were hired. UO has failed to follow those recruiting and search procedures and it has failed to institute the exit interview procedures to determine why minorities leave their positions. Dr. Wade requests the Court to retain its jurisdiction over this Agreement for another three (3) years. He requests the Court to Order UO to implement paragraph 3 of the Agreement. Finally, he requests the Court to order UO to follow its affirmative action procedures, including the

procedures for conducting full national searches with respect to the positions of Vice President for Student affairs and Vice Provost for Institutional Diversity.

DATED: May 23, 2008.

CHANTI & MIDDLETON, P.C.

By: _____
Suzanne B. Chanti, OSB #88179
541/683-2506
541/683-3149
schanti@chantilaw.com.com
Attorney for Plaintiff Joseph Downey Wade

# MUTUAL RELEASE AND SETTLEMENT AGREEMENT

I. PARTIES:

    A. Dr. Joseph Downey Wade (hereinafter referred to as Dr. Wade)

    B. University of Oregon and John Moseley (hereinafter collectively referred to as "University")

II. RECITALS

    A. Dr. Wade was employed by the University of Oregon for over 28 years. The majority of that time Dr. Wade served with dedication as the Director of Academic Advising.

    B. Dr. Wade voiced concerns regarding the University's commitment to achieving ethnic and racial diversity in the University workforce, particularly with respect to Officers of Administration and other employees at the highest administrative and executive levels.

    C. Dr. Wade filed claims against the University alleging that the University engaged in a pattern and practice of race discrimination, that he was a victim of race discrimination, and that he was retaliated against in the terms and conditions of his employment because of his claims of unlawful discrimination. Complaints were filed in Federal District Court of Oregon, Case No. 01-6178-HO, and in Lane County Circuit Court for the State of Oregon, Case No. 16-01-10914. The University denies these charges.

    D. The University is committed to achieving ethnic and racial diversity in its workforce, including employment of minorities as Officers of Administration and in other positions at the highest administrative and executive levels.

    E. The Parties have determined that it is in their mutual best interests to resolve all disputes between them and for the University to take additional steps to demonstrate that it is committed to issues concerning ethnic and racial diversity in its community and to assure that its policies and practices, including those related to employment, are designed to best serve these goals.

III. AGREEMENT

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL PROMISES OF THE PARTIES, THE PARTIES AGREE AS FOLLOWS:

    A. UNIVERSITY AGREES

        1. **Create Administrative Position of Vice Provost for Institutional Diversity or Similar Title**

        a. The University shall create the position of Vice Provost for Institutional Diversity or similar title for a minimum of five (5) years, subject to standard resource review. This position shall be vested with the responsibility for University-wide diversity matters and concerns regarding faculty, students and staff. The purpose of the position is to further the goal of equal opportunity and participation for ethnic and racial minorities in the campus community,

including employment at the administrative and executive levels. Specifically, the position shall be charged with the following responsibilities:

    (1) Work collaboratively with University officials, including those at the policy-making level, to improve the workplace experiences of ethnic and racial minority employees.

    (2) Develop and implement a communications plan to respond to the various "Diversity Reports" already written and submitted by different students and faculty groups over the past several years and also develop and implement a diversity plan.

    (3) Act as a consultant on multicultural concerns and coordinate and oversee the various committees, task forces and groups focusing on diversity.

    (4) Initiate and assist in University-wide projects and programs aimed at increasing the pool of qualified ethnic and racial minority scholars preparing to enter the professorate and to enter and to seek promotion into administration at all levels, requiring collaboration with the Office of Affirmative Action and Equal Opportunity.

    (5) Act as the President's liaison in campus and community for diversity-related matters with the authority and responsibility to promote the advancement of multicultural and diversity-related issues on campus.

    (6) Serve as a resource and support person for affirmative action and human resources operations to help insure that the University is an equal opportunity employer.

    b. The administrator in this position shall have access to information regarding diversity issues.

    c. The position shall be a member of the Council of Deans.

    d. In filling the position, all University affirmative action principles and procedures shall be adhered to and the University shall make vigorous efforts to recruit and hire a qualified person of color or someone who has clearly demonstrated sensitivity to and accomplishments in issues of diversity, including race.

    e. University officials shall begin a candidate search process by May 15, 2002. A good faith effort will be made to hire a candidate as soon as possible. In any event, the successful candidate shall begin work in this position no later than July 1, 2003.

    f. The successful candidate shall be given a one-year contract and will be eligible for subsequent two-year contracts on the same basis as other employees in similar positions. The individual holding the position will be evaluated as other employees in similar positions consistent with University Administrative Rules. As part of the five-year evaluation, University officials will provide an opportunity for comments from University teaching and administrative ethnic and racial minority employees.

g.   The position shall pay a competitive salary commensurate with the successful candidate's expertise and experience and that is consistent with UO comparator salaries on a national and internal basis.

h.   The University President shall use the announcement of this position to publicly affirm that the administration values diversity and is sensitive to and recognizes that issues of race are a concern to the University community and are a priority of the administration.

2.   **Hire of Vice President for Student Affairs**

The University intends to fill the position of Vice President for Student Affairs on a permanent basis. However, due to the current budget situation, it is unclear if the University will be able to fulfill its intention. When, and if, the University fills the position of Vice President for Student Affairs on a permanent basis, all University affirmative action principles and procedures shall be adhered to and the University shall make vigorous efforts to recruit and hire a qualified person of color, or someone who has clearly demonstrated sensitivity to and accomplishments in issues of diversity. If the University fills the position on a permanent basis within the period of the Court's jurisdiction of the Agreement, the Vice President for Student Affairs shall report directly to the Senior Vice President and Provost.

3.   **Implementation of Exit Review**

The University shall develop and initiate a systematic exit interview protocol for all faculty and staff leaving the University, in order to ascertain the basis for their departure. These exit interviews will be made available to the Director of Affirmative Action for his review. This shall be implemented by August 31, 2002. The results of these interviews will be made available to the Vice Provost for Institutional Diversity.

4.   **Search for New Director of Affirmative Action**

The current Director of Affirmative Action has resigned. In filling this position, all University affirmative action principles and procedures shall be adhered to and the University shall make vigorous efforts to recruit and hire the most qualified applicant who has clearly demonstrated sensitivity to and accomplishments in issues of diversity.

5.   **Annual Report on Number of Faculty and Staff of Color and Women**

The University shall make available a report containing its workforce data, including data regarding ethnicity and gender for the current and past year.

7. Retirement

a. The University agrees to rescind the non-renewal of Dr. Wade's contract to allow Dr. Wade to retire effective June 30, 2001, and to provide Dr. Wade with all the benefits and privileges available to a retired administrator at the University of Oregon with 28 years of service.

b. The University agrees to grant Dr. Wade the status of Administrator Emeritus.

B. NO ADMISSION OF LIABILITY

It is understood and acknowledged by Dr. Wade that this Mutual Release and Settlement Agreement is intended to settle and compromise disputed claims between Joseph Wade, John Moseley, and the State of Oregon, University of Oregon (and its officers, employees and agents); that this Mutual Release and Settlement Agreement does not constitute an admission of any legal liability and/or fault; and that payment is being made by or on behalf of Moseley and the University of Oregon solely to avoid the future and/or further incurring of defense costs.

C. RELEASE OF ALL CLAIMS

The undersigned Parties, being of lawful age and not less than 21 years, do hereby forever release, acquit and discharge each other, and their respective officers, employees, agents (and their spouses, family members, successors and assigns) and any and all other persons, firms, corporations or entities, from any and all rights of action, claims or demands whatsoever arising or accruing against each other prior to the effective date of this Settlement Agreement including, but not limited to, rights of action, claims or demands for any and all injury to mind, body, property, reputation, economic loss, earning capacity, legally recoverable attorney fees, and legally recoverable costs and/or disbursements, whether now known or not or which may hereafter develop, whether or not stated by any pleading in the above-referenced civil action. The Parties recognize and hereby acknowledge that their respective present belief and information as to the nature and extent of any of their respective legal rights, claims, demands, actions or causes of action may prove to be mistaken or incomplete, but each of the Parties are willing to give up all possibility of any further payment or any further recovery or relief from; by, or against any of the Parties and/or person(s) mentioned, named or released by or in this Mutual Release and Settlement Agreement, in return for the settlement being made now. The

sole exception to this release of all claims is that the State of Oregon does not release Dr. Wade from any claims arising from statutes or laws relating to taxation.

### D. DISMISSAL OF ALL CLAIMS

Dr. Wade agrees to dismiss all claims filed in state or federal court with prejudice and without costs and fees to any Party.

### E. RESPONSIBILITY FOR TAX LIABILITY

Dr. Wade agrees to pay all taxes which may be owing by him, if any, on the amounts paid pursuant to this Settlement Agreement.

### F. SEVERABILITY

If any provisions of this Settlement Agreement is judicially determined to be unenforceable, the remaining provisions shall nevertheless be enforceable and shall be construed as if the unenforceable provisions were deleted.

### G. WAIVER

No Party to this Settlement Agreement shall be deemed to have waived any rights hereunder unless such waiver shall be in writing and signed by the Party or the Party's representative. No delay or omission on the party of any Party in exercising any right shall operate as a waiver of such right or any other right. A waiver by any Party of a breach of a provision of this Settlement Agreement shall not constitute a waiver of or prejudice the Party's right otherwise to demand strict compliance with that provision or any other provision of this Settlement Agreement.

### H. LAW OF AGREEMENT

This Settlement Agreement shall be interpreted under and enforced in accordance with the laws of the State of Oregon applicable to contracts made and to be performed entirely within such state.

### I. INTEGRATION

The terms of this Settlement Agreement are contractual and not merely recitals. This Settlement Agreement contains the entire agreement of the Parties hereto. All signatories to this Agreement acknowledge that there were no other understandings, promises, covenants, agreements, or representations made to any Party concerning the subject matter of this Settlement Agreement other than those terms or conditions set forth herein above or herein below.

J.   CONTINUING JURISDICTION

The Parties acknowledge that the University is committed to improvement which envisions progressive change within its administration. This agreement is to be consistent with the flexible development of programs necessary to meet the mission of the University. To facilitate this process, as well as give assurances to Dr. Wade, the Federal District Court shall retain jurisdiction over this matter, not to exceed six years from the date of the execution of this Agreement. If, prior to six years, the Court becomes satisfied that the objectives of this Agreement have been attained, then the Court may, at its discretion, terminate jurisdiction.

\* \* \* \* \*

The undersigned Parties have each carefully read and understand this Settlement Agreement, have consulted whatever legal counsel each of said Parties may feel or have been advised to be necessary, and sign this Settlement Agreement freely and without reservation.

CAUTION! READ BEFORE SIGNING!

_____
JOSEPH DOWNEY WADE

STATE OF OREGON    )
                   ) ss.
County of Lane     )

SUBSCRIBED AND SWORN to before me this 3rd day of June, 2002.

_____
Notary Public for Oregon
My Commission Expires: 1/10/05

\*\*Additional Signatures to Follow on Next Page\*\*

_____
JOHN MOSELEY

STATE OF OREGON    )
                   ) ss.
County of Lane     )

SUBSCRIBED AND SWORN to before me this 31st day of May, 2002.

OFFICIAL SEAL
KATINA R NAVARRO
NOTARY PUBLIC-OREGON
COMMISSION NO. 314555
MY COMMISSION EXPIRES JULY 20, 2002

_____
Notary Public for Oregon
My Commission Expires: 7-20-02

_____
UNIVERSITY OF OREGON

STATE OF OREGON    )
                   ) ss.
County of _____ )

SUBSCRIBED AND SWORN to before me this ____ day of May, 2002.

_____
Notary Public for Oregon
My Commission Expires: _____

Approved for Legal Sufficiency:

# CERTIFICATE OF SERVICE

I caused a true, full and complete copy of the foregoing **MOTION TO ENFORCE SETTLEMENT AGREEMENT** to be served on counsel for Defendants as follows:

James S. Smith
Senior Assistant Attorney General
Department of Justice
1162 Court Street, NE
Salem, OR 97301-4096
james.s.smith@doj.state.or.us
  Attorneys for Defendants

by electronic transmission and by first-class mail posted on May 23, 2008, enclosed in a sealed envelope, postage prepaid.

          CHANTI & MIDDLETON, PC

          By:_____
          Suzanne B. Chanti, #88179
          541/683-2506
          541/683-3149 fax
          schanti@chantilaw.com
          Attorney for Plaintiff